ENRON OIL TRADING & TRANSPORTATION CO.,
F/K/A UPG FALCO, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 87–09–00935

(Dated March 29, 1993)

*Law Offices of Hebert Peter Larsen* (*Herbert Peter Larsen* and *Debra Weiss*) for plaintiff.
*Stuart E. Schiffer,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, United States Department of Justice, (*Mark S. Sochaczewsky*) for defendant.

OPINION

MUSGRAVE, *Judge:* The parties to this action having submitted the same for decision and judgment after trial in San Francisco, California on January 28, 1993, and this Court having given due consideration to the testimony of five witnesses for plaintiff and two witnesses for defendant, together with due consideration of the uncontested facts, claims and defenses, and exhibits attached to the pre-trial order herein, this Court now enters judgment for plaintiff on the basis of the Findings of Fact and Conclusions of Law set forth below.

FINDINGS OF FACTS

1. Enron Oil Trading & Transportation Company is the successor in interest to UPG Falco, Inc., the importer of record of the present shipment and of six (6) other shipments of merchandise which it claims to be similar in all material effects and which are the subject of two (2) other cases before this Court.

2. The merchandise in issue in the instant action consists of 272,209 Bbls. (11,432,794 gals.) of Romanian petroleum blendstock exported from its country of origin on December 13, 1985 directly to the United States aboard the vessel *MT Orchid B.*

3. The merchandise was entered at the District of San Francisco, California, by means of Consumption Entry No. 86–122596–9 on January 18, 1986, under Item 475.65, Tariff Schedules of the United States ("TSUS"), as "Mixtures of hydrocarbons n.s.p.f., derived wholly from petroleum, shale oil, natural gas, or combinations thereof, which contain by weight not over 50 percent of any single hydrocarbon compound: In liquid form * * *." at the duty rate of 0.25 cents per gallon.

4. The Customs Service, upon liquidation, reclassified the merchandise under Item 475.25, TSUS, as "Motor fuel" at the duty rate of 1.25 cents per gallon.

5. Plaintiff protested the liquidation on grounds that the merchandise was erroneously classified, asserting by protest and pleadings that the correct classification of the merchandise is under Item A407.19, TSUS, as a benzenoid mixture eligible for duty-free treatment.

6. The merchandise at issue was sold by Petrolexport Import of Romania for exportation to the United States to Mabanaft A.G. under a

through bill of lading and was resold en route to UPG Falco, Inc., without entering the commerce of any other country at any time subsequent to its exportation from Romanina.

7. The merchandise at issue was reported upon entry as the product of Romania and that report was accepted by the Customs Service; wherefore, country of origin was not contested in this civil action.

8. Romania was a designed Beneficiary Developing Country pursuant to the Generalized System of Preferences authorized by Title V of the Trade Act of 1974, Pub. L. 93–618, 88 Stat. 2066, at all pertinent times.

9. The parties agreed before trial that, should the Court reject defendant's classification of the imported merchandise as "Motor fuel," the merchandise should be classified under Item A407.19, TSUS, and accorded duty-free treatment under the Generalized System of Preferences. After trial, the Court pointed out to the parties that Item A407.19 TSUS did not exist in 1986. The parties have since agreed that Item A407.16 TSUS (1986) is the appropriate classification, should the Court reject the defendant's classification as "Motor fuel."

10. The merchandise was classified as "Motor fuel" pursuant to Treasury Decision 83–173 and San Francisco Customs Service Laboratory Report No. 8–86–10891–001, which recited: "This clear Yellow liquid petroleum sample meets our key subset of the ASTM D–439 specification for gasoline motor fuel. This sample has an octane index of 85.4."

11. ASTM D–439, entitled "Standard Specification for Automotive Gasoline" and referenced in Treasury Decision 83–173, does not recite or refer to any "key subset" of its provisions, but sets forth requirements for five (5) "Volatility Classes" of the product.

12. The Customs Service has not produced or published any "key subset" of ASTM D–439 provisions.

13. ASTM D–439 sets forth minimum requirements for what may be considered Automotive Gasoline; contacts for delivery of finished "Automotive Gasoline" in the United States usually incorporate its provisions but often specify additional requirements which may be more stringent.

14. Table I of ASTM D–439 recites pertinent specifications for each "Volatility Class" of finished Automotive Gasoline, each specification to be determined in accordance with test methods set forth in Section 8 of the standard.

15. The aforementioned test methods include the following ten (10) characteristics of product:

    a. Distillation.
    b. Vapor-Liquid Ratio.
    c. Vapor Pressure.
    d. Research Method Octane Number.
    e. Motor Method Octane Number.
    f. Corrosion.
    g. Existent Gum.
    h. Sulfur.

    i. Lead.
    j. Oxidation Stability.

16. The Customs Service Laboratory did not itself perform any of the prescribed ASTM procedures to completion.

17. The Customs Service Laboratory performed a distillation pursuant to the prescribed standard ASTM D–86, but did not complete the process.

18. The Customs Service Laboratory performed a test for the presence of lead by a method different from any of six (6) test methods authorized and prescribed by ASTM D–439.

19. The Customs Service did not attempt to perform the prescribed test methods for the following six characteristics specified in ASTM D–439:

    a. Vapor-Liquid Ratio.
    b. Vapor Pressure.
    c. Corrosion.
    d. Existent Gum.
    e. Sulfur.
    f. Oxidation Stability.

20. The Customs Service Laboratory directed a sample of the merchandise taken directly from the vessel to the Sacramento Laboratory of the Division of Measurement Standards of the Department of Food and Agriculture of the State of California for the purpose of determining Research Octane Number ("RON") and Motor Octane Number ("MON").

21. The Sacramento Laboratory reported RON as 90.9 and MON as 80.0, but the Director of the Laboratory was unable to certify that the respective procedures (ASTM D–2699 and ASTM D–2700) were performed completely, because the pertinent backup records were disposed of 2 years after the tests were conducted, in accordance with the laboratory's standard procedures.

22. Plaintiff directed a sample of the merchandise taken after offloading into a shore tank to Core Laboratories in Long Beach, California for testing with respect to RON and MON, as well as sulfur content. The shore tank contained a small amount of another petroleum product, to which the imported merchandise was added. Plaintiff's witness Mitchell stated that he noticed no effect due to the material in the shore tank, and that if it was "at all close to" unleaded regular gasoline the effect would have been negligible. This testimony was unrebutted.

23. The Long Beach Laboratory reported RON as 89.2 and MON as 80.2, and certified that the respective procedures (as above) were performed twice on the sample under reproducibility conditions of two operators and two sets of apparatus and that the results were found to agree within the more exacting standards of repeatability which normally apply to tests performed twice by the same operator on the same apparatus.

24. The average of RON and MON, referred to as (R+M)/2 or as Anti-knock Index ("AKI") was calculated at Sacramento to be 85.4 and at Long Beach to be 84.7.

25. If the Customs Service had been shown and had accepted the Long Beach report and were the Sacramento report absent, the merchandise would not have been classified as "Motor fuel," since the Customs Service uses an AKI demarcation point of 85.0 in determining tariff classification.

26. Automotive gasoline having an AKI of lower than 87 was sold at the pertinent time only in the Rocky Mountain states.

27. There are substantial differences between the measured distillation characteristics of the merchandise and those reported in definitive survey tests run upon samples of finished 85 AKI gasoline sold in Rocky Mountain test areas during the same period by the Motor Vehicle Manufacturers Association.

28. Production and distribution of 85 AKI gasoline is largely localized in the Rocky Mountain states.

29. No witness had knowledge of any instance of imported Romanian blendstock being used without further blending as automotive fuel.

30. The actual use of the merchandise was as blendstock, and not as motor fuel; the Romanian blendstock was admixed with both premium and regular grades of Exxon unleaded gasoline before sale for consumption.

31. Many blendstocks which are not finished gasolines are produced in the United States which would have measured RON and MON at levels which would compute to AKI numbers higher than 85.

32. One such blendstock is produced by use of Fluid Catalytic Crackers and is called FCC gasoline or FCC stock; it is made at American refineries in quantities exceeding domestic production of finished 85 AKI gasoline by a factor of twenty (20) to one (1).

33. FCC stock typically possess AKI numbers ranging from 85 to 87, but is not suitable for use as motor fuel by itself; it must be blended with other refinery products in order to formulate a finished gasoline.

34. The chief use of petroleum hydrocarbon mixtures having an AKI of between 85 and 87 at the relevant time was as blendstock.

35. No witness would tolerate use of the merchandise in his personal vehicle or recommended such use.

36. Defendant's two witnesses stated that, based upon the totality of laboratory results, including a gas chromatogram of the imported merchandise, it was their opinion that the merchandise was classifiable as motor fuel, for tariff purposes. Both witnesses stated that they would not want to use the merchandise as imported in an automobile.

## CONCLUSIONS OF LAW

1. The merchandise does not belong to a class or kind of product chiefly used in the United States during the pertinent period as fuel for internal combustion or other engines.

2. The merchandise, Romanian petroleum blendstock, is not chiefly used in its imported condition as fuel for internal combustion or other engines.

3. The merchandise was actually used, and belongs to a class or kind of product chiefly used as a blendstock.

4. The presumption of correctness inherent in the tariff classification assigned to the merchandise by the appropriate customs officer has been overcome by the preponderance of credible evidence, including the admission by a Government witness that the Customs Service did not perform all of the tests for the relevant characteristics of the product that are prescribed by the ASTM standard which the Customs Service has adopted.

5. The subject entry should be reliquidated and the merchandise reclassified as mixtures in whole or in part of synthetic organic benzenoid compounds free of duty under item A407.16, TSUS (1986), and refund of all duties paid, with interest, should be made.

Judgment will be entered in conformity with the foregoing findings and conclusions.